# UNITED STATES DISTRICT COURT
for the
Eastern District of California

**SEALED**

| | |
|---|---|
| United States of America | ) |
| v. | ) |
| NATHAN THOMAS BAPTISTA | ) Case No. 1:24-mj-00072-EPG |
| | ) |
| *Defendant(s)* | ) |

**FILED**
Jun 07, 2024
CLERK, U.S. DISTRICT COURT
EASTERN DISTRICT OF CALIFORNIA

## CRIMINAL COMPLAINT

I, the complainant in this case, state that the following is true to the best of my knowledge and belief.
On or about the date(s) of **May 31, 2024** in the county of **Mariposa** in the **Eastern** District of **California**, the defendant(s) violated:

| Code Section | Offense Description |
|---|---|
| 18 USC 2241(a)(1) | Aggravated Sexual Abuse - punishable by a fine or imprisonment for any term of years or life, or both a fine and imprisonment |
| 18 USC 2244(a)(3) | Sexual Abuse - punishable by a fine or imprisonment for any term of years or life, or both a fine and imprisonment |

This criminal complaint is based on these facts:

See attached affidavit of Special Agent Cooper Fouch incorporated hereto.

☑ Continued on the attached sheet.

_____
*Complainant's signature*

Special Agent Cooper Fouch
*Printed name and title*

Sworn to before me and signed in my presence.

Date: **Jun 7, 2024**

_____
*Judge's signature*

City and state: Fresno, CA          Hon. Erica P. Grosjean
*Printed name and title*

IN THE UNITED STATES DISTRICT COURT

EASTERN DISTRICT OF CALIFORNIA

AFFIDAVIT IN SUPPORT OF A CRIMINAL COMPLAINT AND FOR A SEARCH WARRANT TO COLLECT DNA BUCCAL SWABS

I, Cooper Fouch, being duly sworn, do hereby depose and state as follows:

**Introduction and Agent Background**

1. I am a Special Agent with the National Park Service (NPS) Investigative Services Branch (ISB). I have been employed as a Special Agent with the National Park Service since December 2023. From 2011 to 2017, I was a uniformed Law Enforcement Officer with the United States Forest Service (USFS); and, from 2017 to December 2023, I was a Special Agent with the USFS.

2. I am a graduate of the Federal Law Enforcement Training Center's Land Management Police Training Program (2011) and Criminal Investigator Training Program (2018). My primary duties include detecting, investigating, apprehending, and prosecuting criminal activity on and relating to public lands administered by the NPS.

3. I have investigated a multitude of crimes that have occurred on public lands administered by the USFS and the NPS. Some of the investigations I conduct involve sexual offenses and violent crimes that have occurred within NPS lands. I have received about 40 hours of specific training on the investigation of sexual offenses.

4. I am a "law enforcement officer (LEO)" of the United States within the meaning of that term contained at 18 U.S.C. § 2510(7) who is empowered by law to conduct investigations of, and to initiate arrests for, various offenses that occur on or affect NPS lands.

5. This affidavit is intended to show only that there is sufficient probable cause for the requested warrant and does not set forth all of my knowledge about this matter. The facts set forth in this

affidavit are based on my own personal knowledge, knowledge obtained from other individuals during my participation in this investigation, including other law enforcement officers, interviews of witnesses, a review of records related to this investigation, communications with others who have knowledge of the events and circumstances described herein, and information gained through my training and experience.

## Applicable Law

- 18 U.S. Code § 2241 (a) "*Whoever, in the special maritime and territorial jurisdiction of the United States or in a Federal prison, or in any prison, institution, or facility in which persons are held in custody by direction of or pursuant to a contract or agreement with the head of any Federal department or agency, knowingly causes another person to engage in a sexual act[1] (1) by using force against that other person; or (2) by threatening or placing that other person in fear that any person will be subjected to death, serious bodily injury, or kidnapping; or attempts to do so, shall be fined under this title, imprisoned for any term of years or life, or both.*

- 18 U.S. Code § 2242 (2) "*Whoever, in the special maritime and territorial jurisdiction of the United States, knowingly (2)engages in a sexual act[2] with another person if that other person is (A)incapable of appraising the nature of the conduct; or (B)physically incapable of declining participation in, or communicating unwillingness to engage in, that sexual act; or (3)engages in a sexual act with another person without that other person's consent, to include doing so through coercion; or attempts to do so, shall be fined under this title and imprisoned for any term of years or for life.*

---

[1] As defined by 18 U.S. Code § 2246(2)(a) the term "sexual act" means—(A)contact between the penis and the vulva or the penis and the anus, and for purposes of this subparagraph contact involving the penis occurs upon penetration, however slight; (B)contact between the mouth and the penis, the mouth and the vulva, or the mouth and the anus;(C)the penetration, however slight, of the anal or genital opening of another by a hand or finger or by any object, with an intent to abuse, humiliate, harass, degrade, or arouse or gratify the sexual desire of any person; or (D)the intentional touching, not through the clothing, of the genitalia of another person who has not attained the age of 16 years with an intent to abuse, humiliate, harass, degrade, or arouse or gratify the sexual desire of any person;

### Jurisdiction

6. This Court has jurisdiction to issue the requested warrant because it is "a court of competent jurisdiction" as defined by 18 U.S.C. § 2711. Specifically, the Court is "a district court of the United States . . . that has jurisdiction over the offense being investigated." 18 U.S.C. § 2711(3)(A)(i).

7. The facts in support of this affidavit occurred within Yosemite National Park. Yosemite National Park is an area of federally owned public land administered by the NPS. Yosemite National Park is an area of the special maritime and territorial jurisdiction of the United States as defined by Title 18 U.S.C. § 7 (3): and by Title 16 U.S.C. § 57. Yosemite National Park is located within Mariposa, Madera, Mono and Tuolumne Counties, all of which are located within the Eastern District of California. As outlined below, the rape occurred at a residence in Yosemite Valley, CA 95389, and is located within Yosemite National Park and the Eastern District of California.

### Persons and Criminal Offenses

8. This affidavit is submitted for two reasons. First, it is submitted in support of an arrest warrant to arrest **Nathan BAPTISTA** for violations of Title 18, U.S.C. 2241(a)(1) and 18 U.S.C. 2242(3). Second, it is submitted to obtain DNA samples from **Nathan BAPTISTA**. As outlined further below, there is probable cause to believe that these samples will corroborate the belief of investigators that **Nathan BAPTISTA** violated Title 18, U.S.C. 2241(a)(1) and 18 U.S.C. 2242(3).

### Summary of Probable Cause

9. As C.J. reported, in the nighttime hours of May 30-31, 2024, Nathan **BAPTISTA** forcibly raped C.J. at his residence in Yosemite National Park. During the rape, **BAPTISTA** strangled C.J. and struck C.J. on multiple occasions.

### Statement of Probable Cause

**C.J.'s Initial Report**

10. On the evening of May 31, 2024, an aggravated sexual assault was reported to off-duty NPS Special Agent (SA) Kristy McGee. Specifically, SA McGee received a text message from C.J., a Yosemite

Hospitality employee, wanting to know how to report a sexual assault from the evening prior. SA McGee contacted C.J. via phone call, and C.J. indicated she had been assaulted by another Yosemite Hospitality employee, named "Nate," the evening prior on May 30, 2024. C.J. did not know his last name, but thought he worked at the Lodge Bar, located on the same Yosemite Hospitality property where C.J. works.

11. C.J. further reported that when she and a friend were walking home they stopped at the house the subject ("Nate") shares with other Yosemite Hospitality employees, identified by C.J. as possibly being a particular unit. C.J. indicated that she was in the living room talking with the subject, nobody else was around, and that is when he assaulted her, further described below.

12. C.J. advised to SA Kristy McGee she did not need immediate medical attention, but the subject was physically violent, and she had visible bruising from the incident. C.J. agreed to being transported to the hospital in Fresno, CA to have a sexual assault forensic exam ("SAFE")[3] completed. SA McGee met with Park Ranger Jason Mosley and the two went to a residence in Yosemite Valley to meet C.J. Then, Park Ranger Mosley took C.J. to her residence to gather the clothing she wore when the incident occurred.

13. At approximately 11:00 PM on May 31, 2024, Park Ranger Jason Mosley transported C.J. to Community Regional Medical Center in Fresno, CA for a Sexual Assault Forensic Exam (SAFE). They remained at the hospital for the remainder of the evening so the SAFE could be completed. Park Ranger Mosley and C.J. returned to Yosemite NP at approximately 09:00 AM on June 1, 2024.

14. On the evening of June 1, 2024, C.J. called SA McGee. C.J. advised SA McGee that C.J. was concerned for her safety and she feared running into the subject. C.J. indicated she thought the

---

[3] A SAFE is a forensic medical examination conducted by a specially trained medical provider to document and photograph injuries inflicted during an alleged sexual assault and to collect possible forensic evidence. I know from my training and experience, DNA evidence and trace evidence (hairs, fibers and fluids) may be collected for later analysis by a crime laboratory to show their possible forensic relevance during an investigation.

AFFIDAVIT OF COOPER FOUCH         4

subject's last name was **BAPTISTA**, after C.J. looked at a work document she had. However, C.J. had never met "Nate" until the evening of the rape.

15. At approximately 10:30 AM on June 2, 2024, C.J. called SA McGee and advised that the work schedule showed Nathan **BAPTISTA** (hereinafter referred to as **BAPTISTA**) was on days off both June 2nd and June 3rd, and he works from 2:00-11:00 PM.

**C.J.'s Statement to Human Resources**

16. On Monday June 3, 2024, SA McGee notified me that Yosemite Hospitality (Aramark) Human Resources interviewed C.J. regarding the incident. NPS SA Tucker and I went to the Human Resources office and met with the Senior Human Resources Manager. The manager confirmed she just spoke to C.J. regarding the incident. What follows in this paragraph are the details that C.J. reported to the manager, per the manager who was interviewed on June 3, 2024. It should be noted that the manager did not do an in-depth interview of C.J. A summary of a more detailed interview done by myself and SA Tucker can be found later in the affidavit.

17. C.J. reported to the manager that she was walking home along the Meadow trail (a trail adjacent to the Tecoya housing complex) with A.B. A.B. is friends with C.J and knows **BAPTISTA**. **BAPTISTA** was outside his housing unit, which is in close proximity to the meadow trail. **BAPTISTA** was drinking wine and invited C.J. and A.B. into his house for a drink. They agreed to go into his house.

18. Finally, C.J reported to the manager that at some point while outside the house in the yard, **BAPTISTA** kissed C.J. and C.J. said "no." A.B. left, and only **BAPTISTA** and C.J. were present in the residence. **BAPTISTA** then beat, strangled, and raped C.J. on the couch in the living room. The manager observed visible bruising on C.J. She sent C.J. home from work. She provided SA Tucker and I with contact information for C.J., **BAPTISTA**, and A.B.

**Medical Documentation of C.J.'s Injuries**

19. After speaking with the manager, SA Cullen Tucker and NPS Victim Specialist Claudine Ronay coordinated a follow-up physical examination for C.J. at the Yosemite Medical Clinic in Yosemite NP, in order to obtain secondary documentation of C.J.'s injuries and bruises. At approximately 3:00 PM on June 3, 2024, C.J. met me and SA Tucker at the Yosemite Medical Clinic. We escorted C.J. into the back entrance of the Yosemite Medical Clinic and she went into an exam room that was set aside for her. After the completion of the physical examination, SA Tucker and I photographed the external bruises and injuries identified by C.J. These included a bruise on C.J.'s left chest, an abrasion on the middle of C.J.'s neck, a bruise on the inside of C.J.'s right bicep, and bruising/discoloration on C.J.'s left eyelid.

**Agent Interview of C.J.**

20. On the evening of June 3, 2024, SA Tucker and I conducted an interview with C.J. Victim Specialist Ronay was also present. During the interview, C.J. reported her and A.B. were walking back towards C.J.'s housing area near Curry Village. As they were walking south along the meadow trail (Ahwahnee Meadow), **BAPTISTA** yelled out to A.B. C.J. and A.B. went over to **BAPTISTA's**. This was the first time C.J. ever interacted with **BAPTISTA**. When they first met **BAPTISTA** said, "who are you, I haven't met you. if I did I would have remembered" or words to that effect. A.B., C.J. and **BAPTISTA** had a few drinks to celebrate A.B.'s birthday. C.J. and **BAPTISTA** talked outside his employee residence. When A.B. was not present, BAPTISTA kissed C.J. C.J. indicated that she pushed **BAPTISTA** away and told **BAPTISTA**, "…we're not doing that. I don't do that. It's not what I'm here for." **BAPTISTA** attempted to kiss C.J again and C.J. pushed **BAPTISTA** away again.

21. After this, A.B. left the residence. C.J. indicated that after A.B. left, **BAPTISTA** wanted to make a fire. C.J. went back inside the residence with **BAPTISTA** to help him build a fire; **BAPTISTA** had

a fireplace inside his residence. While inside, C.J. and **BAPTISTA** were crouched down in front of the fireplace. C.J. stood up and **BAPTISTA** forced her onto the couch by grabbing her arms and shoving her. He then got on top of her. **BAPTISTA** used his body pressure and body weight on C.J.'s body to hold her down. C.J. indicated **BAPTISTA** started kissing her, pulled her shorts and underwear aside and "entered me" (it was clarified later in the interview, when C.J. said he "entered me" she meant **BAPTISTA** inserted his penis into her vagina).

22. C.J. stated **BAPTISTA** hit C.J. in the face. C.J. stated, "He was slapping me in the face, and I was telling him to 'stop' and he started choking[4] me and he wouldn't stop. I just kept telling him to stop. I told him to stop choking me. And when he stopped choking me, he just started hitting me in the face again. There's not any moment that he wasn't choking me or slapping me in the face. I was clenching my legs together to try to get him off of me. That's when he started pinning me down and screaming at me to open my legs more. And I kept telling him to stop, he kept hitting me and kept choking me until he was fucking done."

23. When asked specifically about the strangulation, C.J. indicated **BAPTISTA** put both hands around her neck and pushed down in the middle of her throat, inhibiting her ability to breathe. When asked how many times **BAPTISTA** strangled her, C.J. indicated she couldn't count. C.J. stated, "I can't count how many times he choked me. I can't count how many times he hit me. He would not stop. I'd tell him to stop fucking choking me. So he'd stop and then he'd just hit me harder and I'd say stop hitting me and he'd choke me harder."

---

[4] It should be noted that choking refers to an obstruction in the airway which is different from strangulation. The undersigned is aware, based on my training and experience, that it is common for lay people to use the terms choking and strangulation interchangeably. Based on what C.J. described during the interview, I believe she was referring to strangulation as a mechanism of injury rather than choking.

24. When asked specifically about **BAPTISTA** hitting her, C.J. indicated he was hitting her face with an open hand and his palm. **BAPTISTA** hit C.J. on both sides of her face, but she reported that he was hitting her harder on the left side of her face.

25. C.J. indicated that, at one point **BAPTISTA** pinned her arms down above her head on the couch with his hands. Specifically, **BAPTISTA** grabbed C.J.'s arms on her biceps and he had her arms pinned down above her head. C.J.'s arms were not pinned down very long because **BAPTISTA** went back to hitting her.

26. C.J. indicated she was trying to block **BAPTISTA** from hitting her in the face, and she was trying to peel **BAPTISTA's** hands off her neck, but she couldn't. When **BAPTISTA's** hands were around C.J.'s neck, she tried to dig her fingers between her neck and **BAPTISTA's** hands in order to loosen his hands and get them off.

27. C.J. indicated it did not stop until **BAPTISTA** was done (SA Tucker clarified that C.J. meant when **BAPTISTA** ejaculated). C.J. did not know where **BAPTISTA** ejaculated. **BAPTISTA** fell asleep after the alleged rape. When **BAPTISTA** fell asleep, C.J. left immediately. C.J. was going to take the bus home, but she decided to walk and got home at about 04:00 AM.

28. Prior to concluding the interview, I conducted a strangulation investigation supplemental report with C.J. We also discussed with C.J. the whereabouts of the clothing she was wearing on the night of May 31, 2024. C.J. indicated that during the abovementioned SAFE, the medical provider only collected her underwear. After the SAFE she threw everything else away. This included everything she was wearing, the backpack she took with her to the SAFE exam, and the purse that was in the backpack. C.J. threw the items away because she didn't want to look at anything. All of the items were stuffed into a yellow Patagonia brand backpack with a Yosemite Hospitality label on it. CJ threw the backpack away in a dumpster in the New Curry residential area, near her residence.

**Collection of C.J.'s Backpack**

29. After the interview concluded, C.J. agreed to drive by the house and show me where the above referenced incident occurred. C.J. pointed at a specific residence in Yosemite Valley, CA 95389 and indicated the rape occurred at the residence with the silver SUV and car parked in front of it.

30. We then proceeded to the housing area adjacent to Curry Village. C.J. navigated us to the dumpster where she threw the above-mentioned items away and identified the dumpster. NPS Fire Captain Ludwig retrieved the backpack out of the dumpster with a pike pole. The backpack had the items that C.J. described wearing when she was assaulted. We seized the items as evidence.

**Interview of BAPTISTA**

31. On June 4, 2024, SA Tucker and I attempted to contact BAPTISTA at the 9013 Tecoya Road, Unit H103. I knocked on the door multiple times; however, no occupants responded or came to the door to answer it.

32. I contacted the Yosemite Hospitality Human Resources Manager. I requested that the Human Resources Manager contact **BAPTISTA** and have him report to the human resources office so that we could interview him. A short time later, the Human Resources Manager contacted me and indicated **BAPTISTA** would be reporting to the human resources office instead of his normal work location at 14:00 hours.

33. Upon **BAPTISTA's** arrival, the Human Resources Manager had **BAPTISTA** wait in the human resources conference room. SA Tucker and I entered the conference room and introduced ourselves to **BAPTISTA**. I advised **BAPTISTA** that he was free to leave. **BAPTISTA** was read his Miranda Rights from a NPS form. **BAPTISTA** indicated that he understood those rights and agreed to speak with us. Additionally, **BAPTISTA** signed the waiver of rights.

34. What follows is a summary of **BAPTISTA's** statement. During the interview with **BAPTISTA**, he reported he had been at work and got off work late, around 11:00 PM. **BAPTISTA** was home,

having a glass of wine when he heard A.B.'s voice. A.B. was walking by with AB's friend(C.J.), who's name **BAPTISTA** could not recall throughout the interview. **BAPTISTA** asked A.B. and C.J. if they would like to have a glass of wine. A.B. and C.J. came in and had a glass of wine with **BAPTISTA**. At some point the three of them went outside and continued to hang out. Additionally, **BAPTISTA** offered A.B. and C.J. some Wild Turkey to celebrate A.B.'s birthday. **BAPTISTA** resides with a roommate who was home at the time but was upstairs.

35. Sometime later, A.B. left, although **BAPTISTA** didn't see him leave. C.J. suggested they go back inside the premises and build a fire. **BAPTISTA** stated he believed C.J. asked A.B. to leave so she could be alone with Baptista, although Baptista did not witness this. C.J. and **BAPTISTA** were sitting on the couch talking and C.J. "decided she wanted to be intimate," and **BAPTISTA** claimed that C.J. started making out (kissing) with him. At one point, C.J. got up after they had been kissing and walked around in small circles for a moment and then came back and continued kissing **BAPTISTA**. **BAPTISTA** described this behavior as though C.J. may not have been sure if she wanted to be intimate or not. **BAPTISTA** described this as "strange."

36. **BAPTISTA** then reported that C.J. grabbed his penis. **BAPTISTA** and C.J. took **BAPTISTA's** penis out of his pants and C.J. began preforming oral sex on **BAPTISTA's** penis. The oral sex lasted for approximately two minutes. While C.J. performed oral sex on **BAPTISTA**, he touched the back of C.J.'s head in an attempt to "help her". After **BAPTISTA** touched C.J.'s head, C.J. reacted negatively and stopped performing oral sex on **BAPTISTA**. Although **BAPTISTA** could not remember exactly what C.J. said, he stated C.J. stood up and became verbally aggressive with **BAPTISTA**. **BAPTISTA** believes C.J. said "no" and may have called him an "asshole", and that is when **BAPTISTA** asked C.J. to leave. **BAPTISTA** indicated that C.J. left and he went to bed.

37. During the interview, **BAPTISTA** indicated the interaction was limited to oral sex and he denied vaginal penetration. Additionally, when asked if any sexual acts with C.J. became aggressive or

rough, **BAPTISTA** denied that the encounter was rough, aside from him putting his hand on C.J.'s head to "help her."

38. **BAPTISTA** further stated that he knew why the agents were there to interview him "because it was a crazy thing that happened. The way that she reacted to what I did lead me to believe that I would either be hearing about this one way or another." He elaborated that it was a "strange way to react to the situation."

39. At the conclusion of the interview, I asked **BAPTISTA** for consent to collect a buccal swab for DNA analysis. After a brief conversation regarding our purpose for DNA collection, **BAPTISTA** did not consent.

**Interview of A.B.**

40. On the afternoon of June 4, 2024, SA Tucker and I interviewed A.B. A.B. was the last person with C.J. and **BAPTISTA** at **BAPTISTA's** residence. During the interview, A.B. reported he and C.J. were walking home down Meadow Row (Ahwahnee Meadow Trail) and **BAPTISTA** was outside of a specific housing unit (A.B. Identified the same unit C.J. Identified). **BAPTISTA** apologized for missing A.B.'s birthday party and invited them in for some wine. All three were hanging out for a bit when **BAPTISTA** got out a bottle of Wild Turkey. All three had a couple shots of the Wild Turkey. After drinking the Wild Turkey, all three decided to go outside. They were mostly hanging out around the front door, then they moved over to the side yard. A.B. did not really engage in the conversation that C.J and **BAPTISTA** were having; however, at one point, A.B. recalled C.J. asking **BAPTISTA** questions about Kat. A.B. indicated the conversation between C.J. and **BAPTISTA** did not seem hostile, nor did the conversation seem flirtatious. A.B. did not see any physical interactions between C.J. and **BAPTISTA** either.

41. At approximately 02:00 AM, A.B. asked C.J. if she was ready to go home, but C.J. told A.B. that she was talking to **BAPTISTA**. After telling C.J. he was ready to go the second time, A.B. left and went

back to his residence. At approximately 04:00 AM, A.B. got a text message from C.J. asking where he went.

### Confirmation of BAPTISTA's Residence

42. On June 5, 2024, SA Tucker and I spoke with Yosemite Hospitality Housing Manager, and Yosemite Hospitality Human Resources. They confirmed that **BAPTISTA** is an occupant ina specified unit in, Yosemite, CA 95389 (the same unit A.B. and C.J. Identified). According to the Housing Manager, there are possibly three other occupants within the residence.

### Sexual Assault Forensic Exam Shows Injury

43. Also on June 5, 2024, NPS SA Ben Zahn transferred C.J.'s Sexual Assault Forensic Exam Kit (SAFE Kit), clothing, urine sample and associated report from Community Regional Medical Center in Fresno, CA to the California DOJ Bureau of Forensic Services in Fresno, CA. According to the Forensic Medical Report, C.J. had a red/pink abrasion on the front of her neck, pink/tan bruising on her upper left chest, bruising to her left eye, pink bruising to her left chin, pink/purple bruising on the inside of her upper right arm, and redness on the inside of her right bicep.

### Search of BAPTISTA's Residence

44. On June 6, 2024, National Park Service Law Enforcement and FBI—ERT (Evidence Response Team) executed a federal search warrant at Yosemite, CA 95389. NPS LE personnel entered the premises and conducted a protective sweep. No subjects were located within the residence.

45. Personnel with FBI-ERT entered the residence after it was secured and search the residence per the parameters of the warrant. They located, documented, and seized the following items:

LIVING ROOM:

- Two couch cushions and a throw pillow from the couch in the living room.

- **A long black earring located underneath and in between the couch cushions.**  The earring located and seized has multiple stones and beads up towards the hook, then the remainder of the earring consist of 4 long and thin strips of leather.
- Swabs from three stains that illuminated with alternative light source (ALS) on and surrounding the couch.
    - One on the couch
    - One on the wall next to the couch
    - One on the side table next to the couch

LAUNDRY ROOM:

- Two white dress shirts
- One pair of black dress pants

Upstairs (Room H103B):

- Two white dress shirts, illuminated with staining under ALS.
- One pair of black men's pants, illuminated with staining under ALS on lap.
- One blue blazer with a pocket square with illuminated staining under ALS.
- One pair of light grey pants.

FBI-ERT left an inventory copy of the warrant at the residence.  All items seized by FBI-ERT were transferred to Yosemite National Park law enforcement evidence.

46. After I was provided a picture of the earring, I called C.J.  I confirmed C.J. was wearing earrings when she was sexually assaulted by **BAPTISTA**.  C.J. reported the earrings she was wearing were hook earrings that contained a black stone, two white beads, and a black flat bead.  Below the beads, C.J. indicted there are three or four long pieces of leather, each approximately three to four inches

long. C.J. indicated she did not have both earrings. C.J. usually takes her earrings off and sets them in the same spot. On Friday, C.J. only located one earring. She looked for it and could not find it.

### BACKGROUND ON DNA TESTING

47. Based on my training and experience, and in consultation with other law enforcement officers, I am aware that DNA collected from **BAPTISTA** can be analyzed and compared to DNA samples collected from items of evidence, including SAFE kits, clothing, and textiles for this case. I am also aware that DNA is a unique identifier that will assist in corroborating or refuting **BAPTISTA's** version of the events. Specifically, **BAPTISTA** claimed that no penetration occurred during the encounter. If his DNA is present on the vaginal or cervical swabs collected during the exam, it would undermine his claim.

48. Based on my training and experience, I know that each human has his or her own Deoxyribose Nucleic Acid (DNA) markers, and that, since the inception of the use of DNA in forensic science, DNA analysis has been widely used. Humans may leave traces of their DNA in various forms, including, but not limited to: semen, sweat, and blood. In addition, based on my training and experience, I know that crime laboratories can identify the source of DNA obtained from a crime scene by the comparison of that DNA to the DNA of persons from whom it may have originated.

49. Based on the aforementioned facts, I respectfully request that the Court issue a federal search warrant authorizing agents to obtain forensic/DNA evidence from **BAPTISTA**. This evidence, which will be collected from **BAPTISTA** inside the cheek/gum area utilizing swabs, will be used for comparison to any DNA recovered from the C.J's SAFE kit, DNA recovered from C.J.'s clothes worn on the night of the assault, and DNA recovered from

50. Based on my training and experience, I know that DNA is typically collected from a person by rubbing one or more long cotton swabs against the inner cheek. The swabs are then preserved by being placed in a sterile container and sealed. If this search warrant application is approved, I will follow these protocols by swabbing the inner cheek of **BAPTISTA** with one or more long cotton swabs, provided to me in sterile form. I will then place the cotton swabs in a sterile container and seal the container. I will then place the sterile container containing the swabs into another container

that will be sealed and sent to the Department of Justice, Bureau of Forensic Services, Fresno Regional Crime Laboratory, California (or other agency).

### Conclusion

51. Based on the foregoing, I believe there is probable cause that **BAPTISTA** committed Aggravated Sexual Abuse in violation of 18 U.S. Code § 2241 (a)(1), and Sexual Abuse in violation of 18 U.S. Code § 2242 (3).

52. Furthermore, I have probable cause to believe that **BAPTISTA's** DNA, which may be obtained by swabbing the interior cheek in his mouth, is evidence of the crime. I therefore request that the Court issue the proposed search warrant pursuant to Federal Rule of Criminal Procedure 41. I further request that the National Park Service and the Federal Bureau of Investigation and its designated agents be permitted to collect a DNA sample from **BAPTISTA** pursuant to the warrant.

### Request for Sealing

53. It is respectfully requested that the Court issue an order sealing, until further order of the Court, all papers submitted in support of the requested search warrant, including the application, this affidavit, the attachments, and the requested search warrant. I believe that sealing these documents is necessary because the information to be seized is relevant to an ongoing investigation, and any disclosure of the information at this time may endanger the life or physical safety of an individual, cause flight from prosecution, cause destruction of or tampering with evidence, cause intimidation of potential witnesses, or otherwise seriously jeopardize an investigation. Premature disclosure of the contents of the application, this affidavit, the attachments, and the requested search warrant may adversely affect the integrity of the investigation.

_____
Cooper J. Fouch
Special Agent, National Park Service

Attested to by the applicant in accordance with the requirements of Fed. R. Crim. P. 4.1 by Telephone on ___7___ day of June 2024.

_____
Hon. Erica P. Grosjean
United States Magistrate Judge

Reviewed as to form and substance by:
/s/ *Arin C. Heinz*
Arin C. Heinz
Assistant United States Attorney